IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

QUIROZ V. LINCOLN PUBLIC SCHOOLS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SARA QUIROZ, APPELLANT,

V.

LANCASTER COUNTY SCHOOL DISTRICT 0001, DOING BUSINESS
AS LINCOLN PUBLIC SCHOOLS, APPELLEE.

Filed February 7, 2023.    No. A-22-028.

Appeal from the District Court for Lancaster County: RYAN S. POST, Judge. Affirmed.

Abby Osborn and Joy Shiffermiller, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Joshua J. Schauer and Haleigh B. Carlson, of Perry, Guthery, Haase & Gessford, P.C., L.L.O., for appellee.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Sara Quiroz appeals an order of the district court for Lancaster County, which order granted summary judgment in favor of Lancaster County School District 0001 doing business as Lincoln Public Schools (LPS) on Quiroz' retaliation claim under the Nebraska Fair Employment Practice Act (NFEPA). Based on the reasons that follow, we affirm.

## BACKGROUND

In September 2014, Quiroz was hired by LPS as the lead services coordinator in its Early Childhood Department (the Department). The Department served two primary groups: children age birth through three who have certain developmental delays or disabilities and preschool

children aged three to five. LPS has a contract with the Department of Health and Human Services (DHHS) to provide certain services to children age birth through three who have developmental delays and disabilities. LPS also receives grant money from the Nebraska Department of Education to assist in the administration of the Department.

Quiroz believed that her job as the lead services coordinator for the Department involved two types of duties. First, she was to oversee matters related to the LPS contract with DHHS. In this regard, Quiroz indicated that she "ensured the [D]epartment was meeting statutory obligations in support of training, hiring, appraising, and billing." Second, she was to administer and adhere to certain policies created specifically by LPS. Quiroz was an at-will employee.

In June 2015, LPS hired Cara Lucas-Richt as the director of the Department. In this role, Lucas-Richt was Quiroz' direct supervisor. Contrary to Quiroz' prior supervisor, Lucas-Richt was heavily involved in the day-to-day aspects of her staffs' jobs. She was described by the staff as a "micromanager." Quiroz believed that she did not require as much administrative support as Lucas-Richt provided. She believed that she should simply be able to seek the assistance of her supervisor when necessary. However, immediately after Lucas-Richt's hiring, she and Quiroz shared a professional relationship. In fact, in October 2017, Lucas-Richt completed a positive appraisal of Quiroz' performance.

Shortly after this appraisal was finalized, the relationship between Lucas-Richt and Quiroz became strained. According to Lucas-Richt, one reason for the change in her working relationship with Quiroz was Quiroz' inability to work collaboratively with one of her coworkers, Alexandria Baruth. Baruth was hired by LPS in the fall of 2016 as the early intervention coordinator. She was later promoted to an administrative position, early intervention supervisor. In this role, she and Quiroz had to work closely together to provide uniform messaging to their staff. Quiroz did not believe that Baruth was qualified to be the early intervention supervisor. She also believed Baruth to act unprofessionally in the workplace, including using vulgar language with her staff and failing to adhere to certain regulations and timelines concerning providing families with necessary resources. Quiroz was upset that Baruth was promoted to an administrative position despite Quiroz complaining to Lucas-Richt about Baruth's behavior.

In an effort to repair the working relationship between Quiroz and Baruth, Lucas-Richt held a mediation in late October 2017. The mediation was unsuccessful and the working relationship between Quiroz and Baruth remained problematic. Additionally, Lucas-Richt observed other issues with Quiroz' work performance. For example, Quiroz revealed the name of an anonymous donor to her entire staff; she asserted that Julie Docter, the program coordinator with the Early Development Network at DHHS was her supervisor; she did not accurately keep track of her staffs' work hours; and she questioned Lucas-Richt's decisionmaking in front of other staff members.

In the latter part of the fall semester of the 2017-2018 school year, Lucas-Richt contacted Robbie Seybert, the LPS director of employee relations and personnel, to discuss her ongoing performance concerns with Quiroz. Seybert shared with Lucas-Richt the progressive discipline model utilized by the LPS Human Resources Department. This model includes three stages. First, the employee would be provided with informal notice about not meeting expectations and would be given a chance to make corrections. If those corrections were not made, the employee would

be subject to formal discipline using a written document entitled a Notice of Performance of Concerns. Finally, with continued concerns and problems, the employee could be terminated.

In January 2018, Seybert recommended to Lucas-Richt that she have an informal conversation with Quiroz in order to address the performance concerns Lucas-Richt had been observing. Seybert and Lucas-Richt worked together for several weeks to prepare for this informal meeting. Seybert wanted to ensure that the discussion topics were focused on empowering Quiroz to improve her performance.

At the same time that Lucas-Richt was having discussions with Seybert about Quiroz' performance, Quiroz was raising concerns about Lucas-Richt's leadership and her management of LPS' contract with DHHS. Quiroz had concerns about three different areas in particular.

First, in November 2017, Lucas-Richt discussed a new LPS policy at a staff meeting where Quiroz was present. This new policy involved obtaining supervisor approval for mass distribution of materials to LPS families. While Lucas-Richt indicated that this policy did not restrict Quiroz and her staff from being able to freely distribute information to families about individualized services, Quiroz had concerns that the LPS policy hindered her ability to help families who had children with disabilities and, thus, violated LPS' contract with DHHS. As a result of her concerns, Quiroz reached out to Docter at DHHS. Quiroz asked Docter, informally, about the propriety of the new LPS policy. Quiroz did not consider her telephone conversation with Docter to be an official report of wrongdoing. And, neither Quiroz nor Docter ever informed Lucas-Richt about Quiroz' inquiry. Instead, Quiroz, herself, informed Lucas-Richt that she believed that the LPS policy might violate the contract with DHHS.

Quiroz' second concern involved Lucas-Richt's use of grant money for training of service coordinators. Quiroz believed that a certain percentage of the funds from LPS' grant was to be used toward training her staff of service coordinators. Despite Quiroz' repeated requests for staff training, Lucas-Richt did not approve any such training. Quiroz reached out to Cole Johnson, who was employed by the Special Education Office at the Department of Education, and who was involved in overseeing the use of grant money. During their telephone call, Quiroz made very generalized inquiries about the use of grant money and about the possibility that LPS might be misusing some of its funds. Neither Quiroz nor Johnson considered Quiroz' telephone call to constitute a formal complaint of misconduct. And, neither Quiroz nor Johnson reported having the telephone call to Lucas-Richt. However, in early 2018, a meeting was had between Quiroz, Johnson, Docter, and Lucas-Richt regarding the use of the grant money for services coordinator training. Lucas-Richt was informed during this meeting that the types of training sessions being requested by Quiroz for her staff were appropriate and that grant money should be used for such training. Quiroz did not believe anything changed with regard to the trainings as a result of this meeting.

Quiroz' third concern arose in February 2018 after an incident occurred with a family that Quiroz believed needed to be reported to DHHS' abuse and neglect hotline. Quiroz informed Lucas-Richt about the situation and was told to wait for Lucas-Richt's arrival to continue the conversation about the family and about reporting to DHHS. Quiroz believed that Lucas-Richt was indicating that Quiroz had to have permission to make a report to DHHS. Quiroz believed that this was in violation of state law, as Quiroz was a "mandatory reporter." However, Quiroz conceded that when she directly asked Lucas-Richt whether she was allowed to make the report to DHHS,

that Lucas-Richt informed her that she could make the report, but that she needed to make sure the report was warranted given the facts. Lucas-Richt specifically indicated that Quiroz was never told not to make the report, only that she needed to have specific concerns before making the report. Ultimately, Quiroz reported her concerns of abuse and neglect to DHHS.

As a result of Quiroz' concerns with Lucas-Richt, on February 15, 2018, she contacted Dr. Jane Stavem, who was Lucas-Richt's direct supervisor at LPS. Quiroz informed Stavem that she wished to have a meeting where she could report "contractual concerns" related to LPS' contract with DHHS. The next day, February 16, before Quiroz was able to set up a meeting time with Stavem, Quiroz had a meeting with Lucas-Richt. At this meeting, Quiroz detailed to Lucas-Richt her concerns. Lucas-Richt then indicated to Quiroz that she and Seybert wished to have a meeting to discuss Lucas-Richt's concerns with Quiroz' job performance. Presumably, this is the informal meeting that Lucas-Richt and Seybert had been preparing for since January. The meeting was scheduled for February 19.

After the February 19, 2018, meeting was scheduled, Quiroz' meeting with Stavem was scheduled for February 20. Quiroz then reached out to Lucas-Richt asking her to reschedule the February 19 meeting to a time after Quiroz' meeting with Stavem. Lucas-Richt informed Quiroz that the February 19 meeting would not be rescheduled and that Quiroz needed to attend. In addition, Stavem cancelled the February 20 meeting with Quiroz, explaining that if any contractual concerns existed after Quiroz' meeting with Lucas-Richt and Seybert, that another meeting would be scheduled with the appropriate people to address the concerns.

At the February 19, 2018, meeting, Seybert led the discussion and gave Quiroz the opportunity to express her concerns regarding Lucas-Richt and LPS' compliance with its DHHS contract. Once Quiroz finished expressing her concerns, Seybert ended that part of the meeting and explained that the group would now move into a different meeting. This meeting constituted the informal notice to Quiroz regarding Lucas-Richt's concerns about Quiroz' performance and how Quiroz could best resolve these concerns. At the end of the February 19 meeting, Quiroz was not formally disciplined and nothing about the meeting was placed in her personnel file. However, as a result of what was discussed in the meeting, Lucas-Richt and Seybert determined that Quiroz needed a clearer understanding of her job requirements in order to succeed in the position of lead services coordinator. Lucas-Richt began working with Seybert to create a document titled, "Lead Services Coordinator Expectations." This document was provided to Quiroz on March 8. Quiroz believed that this document effectively changed her role within LPS.

The day after Quiroz was given the "Lead Services Coordinator Expectations" document, she had a meeting with Seybert to report that Lucas-Richt was retaliating against Quiroz due to her raising concerns about Lucas-Richt's leadership and compliance with the DHHS contract. Among other things, Quiroz believed that Lucas-Richt had changed her job responsibilities and effectively demoted her through the "Lead Services Coordinator Expectations" document. Quiroz also believed that Lucas-Richt was treating her differently by not communicating with her and avoiding her. Seybert investigated Quiroz' claims of retaliation.

On March 27, 2018, Seybert filed a report regarding his investigation of Quiroz' claims of retaliation by Lucas-Richt. As a part of the investigation, Seybert interviewed Quiroz, Lucas-Richt, Baruth, services coordinators who Quiroz supervises, and multiple other employees within the Department. In his report, Seybert explains his conclusions as follows:

A key problem with Ms. Quiroz' complaint is timing. It is very clear that Ms. Quiroz' working relationship with Ms. Lucas-Richt and others (specifically Ms. Baruth) started to deteriorate in September/October 2017. Before February 19, 2018 Ms. Quiroz and Ms. Lucas-Richt had a tenuous working relationship and after February 19, 2018, they had a tenuous relationship. Ms. Lucas-Richt has high expectations for all of her leadership team members. She has a "hands-on/micromanagement" approach and does require that they run decisions (both large and small) past her. Ms. Lucas-Richt and Ms. Quiroz have strong personalities, but only one of them is in charge of the Early Childhood Department. **In my investigation I found no examples of retaliation against Ms. Quiroz by Ms. Lucas-Richt**.

(Emphasis in original.)

Throughout the spring semester of the 2017-2018 school year, Lucas-Richt continued to have concerns about Quiroz' work performance, including her opposing Lucas-Richt's policies and procedures and missing important deadlines. As a result of Lucas-Richt's ongoing concerns, she and Seybert drafted a Notice of Performance Concerns. This was provided to Quiroz on April 8, 2018. The Notice of Performance Concerns detailed specific instances in which Quiroz had failed to meet the expectations of her role with LPS. This document was placed in Quiroz' personnel file. Quiroz disagreed with the substance of the document. She continued to maintain that Lucas-Richt's disciplinary measures against her were a result of retaliation.

After receiving the Notice of Performance Concerns, Quiroz contacted Eric Weber, the associate superintendent for Human Resources at LPS and Seybert's supervisor. Quiroz told Weber that she believed that Lucas-Richt was retaliating against her due to Quiroz raising concerns about Lucas-Richt's leadership and compliance with the DHHS contract. Weber conducted his own investigation of the retaliatory claims and issued a report on May 10, 2018. Weber's report concludes that Lucas-Richt did not retaliate against Quiroz:

I secured documentation from Ms. Lucas-Richt including the original Lead Services Coordinator expectations document as well as a copy of the [Notice of Performance Concerns]. The expectations outlined to Ms. Quiroz in the [Notice of Performance Concerns] are legitimate expectations that were previously addressed in some capacity with her (in the Lead Services Coordinator expectations document or verbally[)]. It is reasonable that Ms. Lucas-Richt[] would give additional feedback in the form of a [Notice of Performance Concerns] to Ms. Quiroz given the ongoing concerns and the meeting regarding the Lead Services Coordinator expectations. Overall, Ms. Quiroz appears to take exception to many of the leadership directives, processes and procedures that Ms. Lucas-Richt has established within the department and continues to communicate. Ms. Lucas-Richt is the director of the department and she should expect compliance with processes and procedures that have been established.

While Weber's investigation of retaliation was still pending, an incident occurred with one of the families being provided services by the Department. On May 3, 2018, a services coordinator and service provider went to a local motel to meet with a mother who was trying to obtain services for her children. Upon arriving at the motel, the Early Childhood workers were informed by the

motel manager that the mother seemed to be having a hard time, as she was seen wandering the halls naked with a bottle of liquor, had a man frequently visiting her motel room, and was acting aggressively and intoxicated. When the motel manager brought the workers to the mother's room, the mother would not open the door all the way, stated that she was not dressed, and appeared to be slurring her words. The mother seemed very agitated. When the service providers contacted Baruth, their supervisor, to inform her of the situation, she told the workers to leave because they reported feeling unsafe. The service providers ultimately met with a social worker who advised them to contact the police to conduct a welfare check on the mother.

When the services coordinator who was present at the motel contacted Quiroz, her supervisor, Quiroz asked the coordinator to stay at the motel and wait for Quiroz' arrival. When the police arrived at the motel to conduct the welfare check, Quiroz told the officers that the mother had a documented disability, and that was the reason she was slurring her words and appeared unstable. The police then spoke with the mother and determined that she was not a danger to herself or to others. Quiroz was upset with Baruth, in particular, who Quiroz believed should have known about the mother's disability and should have worked to deescalate the situation rather than get law enforcement involved.

When Quiroz returned to her office, she documented her role in the situation in a billing reimbursement system which is reviewed by employees of DHHS. In her documentation, Quiroz described the actions of LPS employees as "profiling." Lucas-Richt informed both Seybert and Stavem of the May 3, 2018, situation and of Quiroz' involvement in that situation. In response to this information, Stavem wrote an email to Seybert and Weber which stated:

> This person is creating unsafe situations and over stepping her role significantly. While [Lucas-Richt] is the direct supervisor, I am going to request that we move on this immediately due to the liability factor this is creating in one of the departments I oversee. We can't have someone jeopardizing our district's reputation in a state information system because of her incompetence. We also need to remove access to the systems she is accessing immediately.

Seybert agreed with Stavem's assessment of the situation, believing Quiroz' actions "demonstrated a significant lack of judgment . . . and put the lives of children that we serve in jeopardy." According to Seybert, the incident at the motel was "the final straw of the progressive discipline process." Seybert made the decision to terminate Quiroz' employment with LPS:

> I terminated Ms. Quiroz' employment with LPS because she was insubordinate, failed to follow the district's policies and procedures and demonstrated an inability to work well with others in her department; she regularly undermined Ms. Lucas-Richt and her co-workers. Ms. Quiroz also failed to perform several of the duties required by her position as a supervisor over the services coordinators. I received input and information from Ms. Lucas-Richt and others, but the determination was made by me/HR and followed my regular, independent procedures regarding employee discipline.

While Lucas-Richt did not make the ultimate decision to terminate Quiroz' employment, she did agree with Seybert's decision to do so:

Throughout the 2017-2018 school year, Ms. Quiroz was insubordinate, demonstrated an inability to work well with others in her department, and she regularly undermined me and her co-workers. Ms. Quiroz also failed to perform several of the duties required by her position as a supervisor of services coordinators. I worked with Human Resources to assist Ms. Quiroz [to] understand her job duties and improve in her performance, but performance concerns persisted. Human Resources made the determination to terminate Ms. Quiroz, and I agreed with that determination based on the performance issues Ms. Quiroz demonstrated during the 2017-2018 school year.

On May 18, 2018, Seybert and Lucas-Richt met with Quiroz. At the meeting, Quiroz was given the option of resigning or of being formally terminated from her position. Believing that she had not done anything to warrant her resignation, Quiroz declined to simply resign. She was then terminated from LPS.

On May 22, 2018, a few days after her termination from LPS, Quiroz filed a complaint with DHHS and with the Department of Education. In the complaint, Quiroz detailed what she believed were LPS' violations of regulations and laws mandated by the Department of Education. On August 27, 2018, the Department of Education issued its Complaint Investigation Report, detailing its findings. The Investigation Report did find some violations by LPS and advised the school district on implementing certain necessary corrective actions.

On June 25, 2020, Quiroz filed a complaint against LPS in the district court, alleging that LPS had retaliated against her for opposing and reporting actions she reasonably believed to be unlawful under state and federal law. Quiroz relied on NFEPA, Neb. Rev. Stat. § 48-1114 (Reissue 2021). Quiroz requested compensatory damages in the form of lost back pay and benefits, loss of enjoyment of life, and pain and suffering. She also sought attorney fees.

LPS moved for summary judgment, arguing that there were no genuine issues of material fact as to whether it unlawfully retaliated against Quiroz; whether Quiroz engaged in a protected activity; or whether it had a legitimate nondiscriminatory reason for the termination of Quiroz' employment.

Following a hearing, the district court entered a lengthy, thorough order granting LPS' motion for summary judgment and dismissing with prejudice Quiroz' claims against LPS. In granting the motion for summary judgment, the district court stated:

Viewing the totality of the evidence set forth herein in the light most favorable to Quiroz and drawing all reasonable inferences from the evidence in her favor, this Court can find no genuine issue of material fact for trial as to whether there is a causal connection between Quiroz' alleged protected conduct and her termination. Rather than showing that Quiroz was fired in retaliation for concerns raised with her employer, the evidence in the record shows that Quiroz — an at-will employee — was fired for a number of performance concerns, including insubordination and undermining her supervisor, Lucas-Richt, dating back to fall of 2017. For these reasons, the Court finds that LPS is entitled to judgment as a matter of law on Quiroz' NFEPA claim.

Quiroz appeals from the district court's order granting LPS' motion for summary judgment.

## ASSIGNMENT OF ERROR

Restated and consolidated, Quiroz assigns that the district court erred in granting LPS' motion for summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Bonn v. City of Omaha*, 19 Neb. App. 874, 814 N.W.2d 114 (2012). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, giving that party the benefit of all reasonable inferences deducible from the evidence. *Id.*

## ANALYSIS

Quiroz argues that summary judgment should not have been granted in favor of LPS because the district court erred in finding that there was no causal connection between the termination of her employment and her opposition to LPS' violations of state and federal law, pursuant to NFEPA. Quiroz maintains that the termination of her employment was retaliatory. We begin our analysis with discussion of a retaliation claim under NFEPA.

In order to show retaliation under NFEPA, a plaintiff must establish (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action. *Baker-Heser v. State*, 309 Neb. 979, 963 N.W.2d 59 (2021). Having been terminated from employment, Quiroz undoubtedly suffered an adverse employment action. The primary dispute is whether she engaged in protected conduct and whether any such conduct resulted in her termination.

NFEPA makes it unlawful for an employer to discriminate against its employee on the basis of the employee's opposition to an unlawful practice. See, § 48-1114; *Bonn v. City of Omaha, supra*. Section 48-1114(1)(c), under which Quiroz brings her claim, states: "It shall be an unlawful employment practice for an employer to discriminate against any of his or her employees . . . because he or she has opposed any practice or refused to carry out any action unlawful under federal law or the laws of this state." An action is "[u]nlawful under federal law or the laws of this state" if it is "contrary to or in defiance of the law or disobeying or disregarding the law." Neb. Rev. Stat. § 48-1102(15) (Reissue 2021). The Nebraska Supreme Court has previously clarified that NFEPA does not protect an employee's opposition to the unlawful activities of fellow employees. *Wolfe v. Becton Dickinson & Co.*, 266 Neb. 53, 662 N.W.2d 599 (2003). Rather, the evil addressed by § 48-1114(1)(c) is the exploitation of an employer's power over an employee when used to coerce the employee to endorse, through participation or acquiescence, the unlawful acts of the employer. *Baker-Heser v. State, supra*.

In her brief on appeal, Quiroz appears to allege that she engaged in at least five protected actions and that each of these actions, in part, caused her to be terminated from her employment with LPS. We address each of these alleged protected actions in turn.

*Reports of LPS Misconduct to Docter and Johnson.*

Toward the end of 2017, Quiroz contacted Docter, who worked with DHHS, in order to address Quiroz' concern that a change in LPS' policy regarding notifying families about available resources was in violation of LPS' contract with DHHS. Quiroz indicated that her inquiry to Docter was not an official report of wrongdoing by LPS or Lucas-Richt but was instead a chance for her to ask Docter's opinion of the policy. Docter indicated that she did not take any action toward LPS after her conversation with Quiroz, nor did she ever report the substance of her conversation with Quiroz to Lucas-Richt or anyone else at LPS. As such, the record clearly demonstrates that Lucas-Richt had no knowledge of Quiroz' conversation with Docter.

Around the same time as Quiroz' conversation with Docter, Quiroz also had a conversation with Johnson, an employee of the Department of Education. Quiroz indicated to Johnson that she had concerns about LPS' use of the grant money awarded to it. While she cited to a few specific expenses she had concerns about, the information Quiroz provided to Johnson was largely vague and generalized. Johnson did not take any action after his conversation with Quiroz and he did not report the substance of this conversation to either Lucas-Richt or anyone else at LPS. In fact, Johnson indicated that Quiroz specifically told him that she did not want their conversation to be "on the record." There is nothing in the record to indicate that Lucas-Richt was aware of Quiroz' conversation with Johnson.

Quiroz argues that her reports of LPS' and Lucas-Richt's misconduct to Docter and Johnson constituted protected activity. She further asserts that Lucas-Richt later retaliated against her for such protected activity. Assuming without deciding that Quiroz' conversations with Docter and Johnson were protected activities, she cannot show that she was retaliated against because of those activities because there is no evidence to indicate that Lucas-Richt or anyone else at LPS knew about the conversations. Rather, the uncontradicted evidence presented at the summary judgment hearing indicates that Quiroz went out of her way to ensure that Lucas-Richt did not know of the conversations. She provided Docter and Johnson only vague and generalized information. She also specifically indicated to those individuals that she was not making a formal report of wrongdoing. Because Lucas-Richt was unaware of the conversations, Quiroz cannot demonstrate a causal connection between her contact with Docter and Johnson and any retaliatory action, including her ultimate termination.

*Report of Concerns to Lucas-Richt and Seybert Regarding*
*Noncompliance With DHHS Contract.*

While the record discloses that Quiroz did not inform anyone at LPS that she had reported her concerns of contract violations to DHHS or the Department of Education, the record does demonstrate that Quiroz informed Lucas-Richt of her concerns regarding contract compliance on February 16, 2018, and then again discussed those concerns during the initial phase of the February 19 meeting with Seybert and Lucas-Richt. The record does not disclose what specific concerns or allegations were asserted by Quiroz, but it appears that she did state her opinion that Lucas-Richt's decisions were placing LPS in violation of some of the terms and requirements of the DHHS contract in both meetings.

Given the lack of specificity as to what allegations Quiroz made in the meetings, it is difficult to assess whether her disclosures constitute protected activity. But assuming without

deciding that her disclosures are protected and that there is a causal connection between those disclosures and her termination, her claim would still fail. In *Baker-Heser v. State*, 309 Neb. 979, 963 N.W.2d 59 (2021), the Supreme Court reiterated its longstanding rule that § 48-1114 refers to complaints about an unlawful practice of an employer as opposed to employees that may be engaged in unlawful activities. See *Wolfe v. Becton Dickinson & Co.*, 266 Neb. 53, 662 N.W.2d 599 (2003). In *Wolfe*, the court found that the statute was concerned "with the exploitation of an employer's power over an employee when used to coerce the employee to endorse, through participation or acquiescence, the unlawful acts of the employer." *Baker-Heser v. State*, 309 Neb. at 990, 963 N.W.2d at 68-69.

Here, the alleged unlawful activity that Quiroz disclosed was her opinion that Lucas-Richt had made decisions that resulted in violations of LPS' obligations under its contract with DHHS and related regulations promulgated by DHHS and the Department of Education. Her complaints on February 16 and 19, 2018, to the degree we can discern them, focused on the actions and decisions of Lucas-Richt, as opposed to LPS itself. Given that focus, we cannot find that her actions demonstrate her opposition to an unlawful act of her employer or that her employer demanded that she participate in an unlawful act. Quiroz' disclosures to Lucas-Richt and Seybert stating her belief that Lucas-Richt's decisions were unlawful do not support a prima facie case of retaliation under § 48-1114(1)(c).

*Attempt to Report Lucas-Richt's Inappropriate Actions to Stavem.*

In February 2018, Quiroz contacted Lucas-Richt's direct supervisor, Stavem, in order to set up a meeting to discuss concerns Quiroz had about LPS' violation of its contract with DHHS and Lucas-Richt's role in those contract violations. The meeting ultimately was cancelled by Stavem and, as a result, Quiroz was unable to address her concerns about Lucas-Richt. Quiroz alleges that her attempt to report her concerns to Stavem was a protected activity and that even though the meeting was cancelled, Lucas-Richt retaliated against her for attempting to speak with Stavem. In particular, Quiroz points to the meeting Lucas-Richt scheduled with her almost immediately after Quiroz reached out to Stavem. At that February 19 meeting, Seybert and Lucas-Richt disclosed Lucas-Richt's concerns about Quiroz' work performance over the last few months.

Upon our review of the record, we do not find evidence to support Quiroz' claim of retaliation in this regard. First, we note that the evidence clearly demonstrates that the February 19, 2018, meeting between Quiroz, Lucas-Richt, and Seybert had been contemplated well before Quiroz reached out to Stavem. Seybert indicated in his affidavit that he told Lucas-Richt in early January that it was time to have an informal meeting with Quiroz about her work performance. Seybert and Lucas-Richt then worked together for a few weeks to outline what was to be discussed at the meeting. As such, the February 19 meeting could not have been retaliation for Quiroz' contact with Stavem in mid-February, because the planning for the meeting predated such contact. Moreover, evidence presented at the summary judgment hearing indicated that when Lucas-Richt scheduled the February 19 meeting with Quiroz, she was not aware of Quiroz' contact with Stavem. She only learned of that contact when Quiroz attempted to reschedule the February 19 meeting. Essentially, Quiroz cannot demonstrate a causal connection between her contact with Stavem and any retaliatory conduct, including her ultimate termination.

*Quiroz' Report of Child Abuse and Neglect*
*Without Lucas-Richt's Permission.*

On appeal, Quiroz alleges that Lucas-Richt and LPS "precluded Quiroz from reporting abuse and neglect of children until she first received permission from [Lucas-Richt]." Brief for appellant at 39. She indicates that this directive was in violation of her status as a mandatory reporter under Neb. Rev. Stat. § 28-711 (Reissue 2016). Quiroz appears to argue that when she raised concerns to LPS officials about this issue, she was retaliated against, and was ultimately terminated from her employment.

Upon our review of the record, we can find no evidence to support Quiroz' claims that she was forced by either LPS or Lucas-Richt to do an unlawful act or that her opposition to such unlawful act resulted in her termination. The evidence does not show that Lucas-Richt demanded that Quiroz refrain from reporting abuse and neglect when Quiroz believed such report to be necessary. Instead, Quiroz admitted that when she directly asked Lucas-Richt whether or not she could make a report, Lucas-Richt told her that she could make a call to report abuse and neglect, as long as she was sure she had enough facts to warrant a report. In fact, Lucas-Richt went further and told Quiroz that if she had a concern about potential abuse or neglect for a family served by LPS, she needed to make a report. Quiroz did, in fact, make the report of abuse and neglect. Based on this evidence, we can find no indication that Quiroz engaged in protected activity with regard to the report of abuse and neglect. Lucas-Richt told her to make the call if she felt it was necessary and Quiroz then made the call as is mandated by § 28-711.

*Formal Complaint to DHHS and Department of Education.*

In her brief on appeal, Quiroz discusses at length the formal complaint she filed against LPS with DHHS and the Department of Education. She explains her "complaints of misuse fraud and abuse," in addition to LPS' violations of the terms of the DHHS contract and of state and federal law. Brief for appellant at 34. She also discusses at length the Department of Education's findings with regard to her allegations, indicating that some of her concerns were, in fact, valid. LPS was required by the Department of Education to take some corrective action based on Quiroz' complaint. However, Quiroz' filing of the complaint with DHHS and the Department of Education cannot support her claims of retaliatory discharge, because Quiroz filed the complaint on May 22, 2018, 4 days after her employment with LPS had been terminated. She presents no evidence to suggest that LPS was aware prior to her termination that she intended to file such a complaint. Because Quiroz' action in filing the complaint occurred after her termination, it cannot be the cause of her termination. Quiroz has not demonstrated any causal connection between her protected activity and her termination.

Based upon our review of all the evidence presented at the summary judgment hearing, we do not find any support for Quiroz' claim that the termination of her employment with LPS was the result of retaliation pursuant to § 48-1114(1)(c). The evidence does not demonstrate that any protected activity engaged in by Quiroz during her tenure was the cause of an adverse employment action, including her termination. Rather, we agree with the findings of the district court that LPS demonstrated valid performance-based reasons for terminating Quiroz' at-will employment. The evidence revealed that these performance concerns arose during the fall of 2017, prior to Quiroz

engaging in any protected activity. As such, we must affirm the district court's decision granting LPS summary judgment.

CONCLUSION

We affirm the decision of the district court to grant LPS' motion for summary judgment and to deny Quiroz' claims of retaliatory termination pursuant to § 48-1114(1)(c).

AFFIRMED.